**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO.  2:24-cr-29 |
| | ) | |
| ANDREW KROSS, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S AMENDED POSITION WITH RESPECT TO SENTENCING

COMES NOW, the defendant, Andrew Kross, through counsel, and in accordance with 18 U.S.C. Section 3553(a) and Section 6A1.2 of the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), respectfully submits to this Honorable Court his position with respect to sentencing.  Mr. Kross has no objections to the Pre-Sentence Report ("PSR").  The mandatory minimum sentence in this case is fifteen years. For the reasons set out below, Mr. Kross respectfully requests that this Honorable Court vary from the recommended Sentencing Guideline range and sentence him to 15 years imprisonment followed by a term of supervised release with conditions and required sex offender registration as a sufficient but not greater than necessary sentence.

In further support of his position, Mr. Kross, through counsel, offers the following:

### Motion for a Departure under Section 5H1.11

Mr. Kross moves for a departure under U.S.S.G. section. The United States Sentencing Guidelines have a departure provision, 5H1.11, which provides that "[m]ilitary service may be relevant in determining whether a departure is warranted, if

1

the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."

In assessing this departure, the Court should begin its analysis by reviewing the sealed psychosexual report of Mr. Kross by Dr. Jonathan Deright. [1] His report provides, in pertinent part:



---

[1] *See* Exhibit A





The Sentencing Commission published a resource regarding this provision.[2] That resource explains that "First, courts have considered the type of service and whether it warrants consideration based on a traditional practice of recognizing military service to one's country. Second, courts have considered whether the defendant suffers from a mental or emotional condition that is traceable to the defendant's military service and whether the condition contributed to commission of the offense." *Id.* at 1.

After reviewing numerous cases, the report concludes that "[c]ourts have often considered the impact military service has on the individual before the court; sometimes courts impose more lenient sentences when, in the court's view, the defendant suffers from a mental or emotional condition that is traceable to the defendant's military service. Courts will continue to confront the issues related to PTSD, TBI, and other effects of military service, as well as how to appropriately recognize one's service to one's country." *Id.* at 13.

Often a request for a departure under this provision is made by defense counsel with only the first factor--the "traditional practice of recognizing military service to one's

---

[2] Available at
https://www.ussc.gov/sites/default/files/pdf/training/primers/2012_01_Military_Service_5H1-11_Departures_Booker_Variances.pdf

country." And such departures/variances are common in this Court. Less common are circumstances where both factors present, in which there is not only the presence of a service history, but also "the defendant suffers from a mental or emotional condition that is traceable to the defendant's military service" and "the condition contributed to commission of the offense." In view of the defendant's military history, which led to an "exacerbation of PTSD" initially caused by "childhood trauma," Mr. Kross is the type of individual for whom this departure is appropriate, and the Court should grant a departure in this case.

**Sentencing Factors Under Section 3553(a)**

Mr. Kross has taken responsibility for, and acknowledged the gravity of, his conduct.

### A.  Mr. Kross's Background and History

As noted above, Mr. Kross served in the military prior to engaging in the conduct that is the subject of this case. In the course of his service, he witnessed "bombs dropped on video and did not consider the impact that seeing this type of action on video would have on him. He reported that he saw videos of this type over 100 times and that it continues to infiltrate his mind at times." That service, which causally exacerbated his PTSD from himself being sexually assaulted as a child, had a direct and substantial relationship to the conduct in this case. In the event the Court declines to depart under 5H1.11, it should alternatively consider this background in fashioning an appropriate variance.

### B.  Mr. Kross has Made Many Positive Contributions to the Community[3]

1.  Ashley Ferrell

---

[3] *See* Exhibit B, Character Letters

Ms. Ferrell, who knows Mr. Kross from Believer's Church in Suffolk, VA writes that:

> On one instance in particular, Andrew and his wife Camryn were at my home to participate in a small group bible study. Andrew noticed that my faucet in the kitchen was slightly leaking and took it upon himself to take the time to fix the leak for me. On another occasion, Andrew offered his free time and resources to come to a church event where he blew up numerous balloons and helped creatively decorate for the event. After my husband had a medical procedure and was unable temporarily, Andrew Kross offered to transport his own mower and mow our lawn at no cost which was immensely appreciated. Andrew Kross diligently showed up to my home every Tuesday evening to attend and participate in bible study. He always displayed an interest in personal growth and was committed to learning. Over the course of a year, Andrew Kross volunteered to and supplied all paper and plastic items needed for a group of about 20 people (including himself and his spouse) to enjoy dinner together weekly on Tuesday evenings.

2. Tyler Brown

Tyler Brown, from the same church, writes that

> He volunteered at several of our community-serving events like our Fall Fest and Easter egg hunts. These events serve hundreds of families in our community and gives them a safe place to gather for an enjoyable time. He was a key part of facilitating donations for one of our partners called Embrace Foster Care, which serves families involved in the foster care system. In addition to that he always served in our Rise Against Hunger event where hundreds of meals were packed for food insecure families in our city. He also gave tithes consistently to the church which makes a tremendous impact in the community. The majority of what is given in tithes goes to our local and global partners that are making incredible differences in the community. Some of these include Embrace Foster Care (mentioned earlier), the HER Shelter (domestic violence shelter for women and children), Coalition Against Poverty in Suffolk (homeless shelter), and Freekind (fighting against human trafficking. In addition to this, he served in the class I lead that helps people find their community at our church.

3. Leah Chase,

Leah Chase writes that:

Andrew and our daughter have been very active in their church, attending a weekly Bible study, volunteering in various activities such as the annual Fall Festival, Easter celebration and feeding the hungry. Andrew is the type to help an elderly neighbor, or a stranger he sees in need. His character has been shaped by being a boy scout and having a military background. He is quick to jump in and try to help out. When he has visited us, he is quick to volunteer his help with a project or to fix something. He helped us complete demolition work in our kitchen to help save us money. During stressful family wedding preparations, Andrew was a critical part of helping us race the clock to get the venue set up and ready for guests to arrive. He is someone to count on to help any way he can.

4. Shawn Waldau

Shawn Waldau writes that he

shared his lunches with the underprivileged, helped his classmates with their studies if they were stuck & always volunteered at his church…even if he had to get up early. . . When I became disabled in 2001, he helped even more, running to help me carry things/groceries, decorate, chores and also piloting my boat.

5. Todd Chase

Todd Chase writes that:

Some specific examples of Andrew's caring nature that I have observed include him volunteering to help others with household projects (yard work, painting, household repairs, etc.), helping others move, providing food to individuals who are experiencing homelessness, stopping to help people alongside the road who are having car problems, volunteering at his church, volunteering to pack meals to be sent overseas to countries in need, giving his financial resources to help those in need, physically taking an elderly neighbor to the phone store and helping her resolve some issues with her phone company, and when I had some time sensitive household repairs that had to be done immediately, Andrew dropped what he was doing and drove over an hour from where he lived to come help me get them done.

6. Sherry Kross:

Sherry Kross writes that

Our family also volunteered to foster dogs from a kill shelter in Miami. We all agreed that we could do it with the intention that they would not be able to stay with us and the point was to rehome them. Andrew would help in the care and feeding of the dogs as well as posting to help the dogs find new homes and seeking out people looking to adopt dogs through us rather than going to a breeder.

7. Camryn Kross writes:

Andrew served 6.5 years in the United States Navy. . . He loved his job, and was frequently commended for going above and beyond in his role. He was nominated for Sailor of the Year, and received the Navy and Marine Corps Achievement Medal twice. In 2020, Andrew made the decision to separate from the Navy in order to prioritize our dreams of starting a family of our own. It was important to him to be present for our next season of life. Andrew then began working as a government contractor where he continued to diligently support the Naval Aviation Maintenance Center for Excellence. In 2022, Andrew was offered his dream job at Boeing where he continued to support the U.S Navy by being technical support for the squadrons. In every position he held, Andrew has been highly regarded, trusted with great responsibility, and has worked earnestly to support the United States.

In his personal life, Andrew has always prioritized a life of service to his community. He spent his childhood as a very active member of The Boy Scouts and achieved the highest honor of becoming an Eagle Scout. As a teenager, Andrew was required to have a number of volunteer hours for his high school. Because of his desire to help others, he decided to volunteer in the emergency room of a local hospital. After the required volunteering hours were complete, Andrew chose to continue volunteering. He is someone that is always looking for opportunities to help others. There were several instances where Andrew and I were out driving, and we passed by someone struggling with their broken-down car. While other people continued to pass the person by, Andrew always quickly pulled over to help push the vehicle to a safe location. I have witnessed him do this no matter the time of day or night, and in both 100 degrees and the pouring rain. I can think of several specific instances where Andrew was compelled to help someone in need.
Several years ago, Andrew and I were driving around running errands when we saw a homeless man and his dog. Andrew didn't say a word to me, but he rolled his window down and asked the man what he would like to eat. The man answered, and Andrew

8

quickly responded, "What about for your dog?". He then went and bought 5 hamburgers for this man and his dog. Another time, more recently, Andrew and I were again out running errands. We were almost back home, when Andrew said "I'm sorry, but I saw a homeless man back there and I don't know why but I can't get him out of my mind. Can we go back and buy him a meal?". So, we turned around, drove back to the man, asked him what sounded good to eat, and purchased lunch for him. Both of these instances speak to Andrew's compassionate and selfless character. He does not ever expect praise. I believe he would rather nobody have even witnessed these kind gestures. To him, these simple acts of kindness were not a big deal.

. . .

Andrew was the friend that was always volunteering to help someone move heavy furniture into their home or fix a broken appliance. Andrew formed a relationship with our elderly, disabled neighbor shortly after we moved to Virginia. He helped her several times by cutting her trees or doing other odd jobs she needed assistance with around the house. One time specifically, she was very flustered because her phone was not working properly. After talking to her for a bit, we realized she had been scammed into purchasing a plan that was not beneficial for her. Andrew offered to drive her to the AT&T store the next day because he wanted to get the issue resolved, and he did not want her to be taken advantage of again. Andrew rearranged his work schedule and was able to help advocate for her at the store.

He has been an involved member of our church for the last several years. He has served the community by volunteering at events like the annual Fall Festival and Easter celebrations our church puts on for the community. This past December, he organized our bible study group collecting donations for Embrace Foster Care in Norfolk. He donated gift cards, blankets, socks, movie tickets, and zoo passes to be Christmas presents for children in need. In January, he helped pack 60,000 meals with Rise Against Hunger to feed people all over the world. For the last several years, he has consistently donated funds to our church that were used to buy groceries for individuals in need, provide a Thanksgiving dinner to families living in poverty, eliminate the school lunch debt for Suffolk Public Schools, provide resources to the H.E.R Shelter, and support Oasis Social Ministries.

8. The Reverand Mark Sims writes:

Andrew also worked with others in helping to transport and serve meals to individuals who were hungry and often without a

9

permanent home. Andrew, along with his family, would delay their own Thanksgiving mealtime to serve those in the community who, otherwise, would have not eaten that day. Andrew would not hesitate to delay his own gratification in favor of serving the vulnerable people within the community first. Andrew not only went to church, sat, listened and participated, he took seriously the message Christ is trying to impart in all of us. Selfless service to others and the building of community wherever he found himself.

. . .

Andrew came to my parish office one day to discuss his idea of tearing out a portion of the concrete sidewalk on one side of the church and building a wheelchair accessible ramp to the parking lot. An undertaking that even the adult men's group shied away from because of the sheer physical labor involved.

These are just some of the many letters submitted on his behalf, whose authors will appear at sentencing in support of Andrew. Andrew has lived a generous and purposeful life, and his service-filled life merits consideration under section 3553(a).

## C. Family & Community Support

Unlike many individuals who face sentencing in federal court, Andrew has the benefit of a strong, loving, and supportive family and community. This is evident from the numerous letters that have been submitted as exhibits with this pleading. Moreover, it is this level of family support that will ensure Andrew's reentry and rehabilitation.

The importance of family support has been highlighted in both qualitative and quantitative research efforts using a variety of samples across the United States. Existing research has shown that family support correlates with decreased recidivism,[4] increased odds of employment,[5] and better mental health outcomes[6] during reentry. "[F]or most

---

[4] John H. Boman, IV and Thomas J. Mowen, *Building the Ties That Bind, Breaking the Ties That Don't, Criminology & Public Policy* 16:753–74 (2017); Tracey L. Shollenberger, Urban Institute, *When Relatives Return: Interviews with Family Members of Returning Prisoners in Houston, Texas* (2009).

[5] Mark T. Berg and Beth Huebner, Reentry and the Ties That Bind: An Examination of Social Ties, Employment and Recidivism, *Justice Quarterly* 28:382–410 (2011)

former prisoners, relationships with family members are critical to successful reintegration."[7]  Family members, like those in Andrew's family, provide  both strong affectionate bonds (like emotional support and attachment) and important mechanisms of social support (like housing, transportation, and financial support). These are essential and can serve to reduce recidivism and promote Mr. Kross's successful reentry.

In addition to the support of his family, Andrew also enjoys the support of members of his community.  As seen from the many letters, Mr. Kross comes from a family with a deep since of faith.  His wife, Camryn, is an active member of Believers Church, which is a nondenominational church located in Suffolk, Virginia. [8] The Kross family has been part of this church for several years and have the support of the church leadership and members. [9]  This community support is crucial and will be a great benefit to Andrew upon his release from incarceration. "Finding a place in the community to be and to positively associate are incredibly important elements of building a balanced, self-determined lifestyle free of risk to re-engage in harmful behaviors…Ex-offenders …. learn that there can be people who care about them, which leads them to care more about themselves and, by extension, others."[10]

Unlike many individuals leaving prison, Andrew has both the support of a strong

---

[6] Suzanne Grieb, M.D., *et al.,* The Stress Will Kill You': Prisoner Reentry as Experienced by Family Members and the Urgent Need for Support Services, *Journal of Health Care for the Poor and Underserved* 25:1183–200 (2014).

[7] Rebecca L. Naser and Christy A. Visher, Family Members' Experiences with Incarceration and Reentry, *Western Criminology Review* 7:20–31 (2006).

[8] Believers Church, https:// www.believerschurch.org (last visited December 31, 2024).

[9] Exhibit B, Tyler Brown Letter.

[10] Gina Barton, *Community plays a role in helping ex-prisoners,* JSOnline (May 14, 2016), https://archive.jsonline.com/news/crime/community-plays-a-role-in-helping-ex-prisoners-b99718342z1-379536211.html/ (last visited July 12, 2022).

family and faith community.  These are important factors that will ensure his successful

reintegration back into society, and ultimate rehabilitation.

**D.  <u>Mr. Kross is a Low Risk of Recidivism</u>**

With no prior record, Mr. Kross has a very low risk of recidivism, especially upon

being given a 15-year sentence.  Dr. Deright looked at Mr. Black's conduct and future

from a risk assessment perspective. He writes that:







## I.    Avoiding Unwarranted Sentencing Disparities

Section 3553(a)(6) charges this Court with avoiding unwarranted sentencing disparities. A review of prior sentences by the Court in similar cases reflects that in production cases both with and without substantial aggravating factors, this Court has given a sentence at or near the mandatory minimum range. Such explicitly identified aggravating factors include (1) hands-on sexual abuse of minors by the defendant, (2) recidivism, (3) a jury trial, or (4) or a lack of remorse for the conduct. Mr. Kross's case

14

is absent such factors. He shows remorse and reflects a lifetime of good deeds for his family and his community. The lengthy, mandatory sentence of 15 years is appropriate.

By ways of comparison, the following cases in the Eastern District of Virginia are illustrative:

### Prior Sentences of 15 years or Less in Production Cases

1. *United States v. Janes* 1:23CR140 (LMB) (Sentenced to 15 years).

In this case, the defendant had spent his adult life collecting and producing child pornography. Moreover, the defendant also sought to meet minors in person. The government in its sentencing memo noted:

> Amid purchasing CSAM, producing CSAM, and communicating with multiple minor boys, the defendant met Minor Witness 1 in Washington D.C. in February of 2023. See PSR at ¶ 18. The defendant communicated with Minor Witness 1 from July 22, 2022, to May 14, 2023. He groomed Minor Witness 1 for nearly six months, asking for photographs of what he wore on multiple occasions before meeting him in person at a restaurant. *After they met, the defendant tried to escalate their encounters by inviting him to spend the night at his house on February 5, 2023*.

ECF. Doc. 39 at 6-7 (emphasis added). Mr. Kross's actions were more limited and less physically dangerous. He never tried to escalate virtual encounters to direct, in-person, physical encounters.

2. *United States v. Daniel*, 1:17CR110 (AJT) (Sentenced to 15 years, 2 months)

In this case, the defendant met in person with the minor victim and twice had sex with that victim. He also sexually abused two other minor victims. According to the government's sentencing memorandum, "[t]he defendant has pled guilty to commercial sex with a 14-year-old child, in violation of 18 U.S.C. §§ 1591(a)(1) & (b)(2), and production of child pornography, in violation of 18 U.S.C. § 2251(a). ECF Doc. 59 at 1. The government also noted that "[i]t is beyond dispute that sex with a 14-year-old

(particularly on more than one occasion) is a particularly horrible offense that deserves significant punishment. The Defendant twice took advantage of a young runaway who was desperate for money." *Id.* He sexually abused two other minor girls as well. The government noted that "[o]bviously, the defendant had no reservations about involving minors in his sexual conduct and such conduct that harms children cannot be tolerated. . . But the production of child pornography is also a grievous offense." *Id.* Mr. Kross too participated in the grievous offense of child pornography. He did not have actual physical contact and sex with any minor victims.

3. ***United States v. Nader,* 1:19cr201 (LMB) (Sentenced to 10 years imprisonment)**

This defendant had a long history of inappropriate sexual behavior with minors, including actual in-person sexual contact that led to his conviction in another jurisdiction. According to the Government's Sentencing Memorandum, ECF Doc. 188:

> Beginning in 1984, his first contact with law enforcement was through the mail he ordered to obtain child pornography and letters sent boys in another state under an alias to mask his detection. PSR ¶¶ 97-100. Then in 1998, he was again under investigation for the same kind of offense. Id. ¶¶ 102-108. In 1991, he was convicted of transportation of child pornography when authorities seized videos surreptitiously hidden in candy tins. Id. ¶ 119. Abroad, the defendant expanded his horizon through direct sexual contact with minors, including contact with the victim in this case leading to the present offense of transportation of a minor, and in 2003, the defendant was convicted in the Czech Republic for offenses related to sexual contact with minors. Id. ¶¶ 27-34, 54-62, 123-126. By 2009, he was corresponding with pedophiles through electronic means, and by 2012, through social media apps leading to the current offense. Id. ¶¶ 17-26, 110-117. The most recent benchmarks were in 2018 and 2019 when the defendant was again was found to possess mobile devices containing chats, videos, and internet searches clearly demonstrating his continual interest in child pornography and the sexual and physical abuse of children. Id. 34-54.

**Prior Sentences of 16 years in Production Cases**

16

While counsel thinks that the just sentence in this case is 15 years of imprisonment, counsel notes that the Court had sentenced above the mandatory minimum in some cases where the conduct is more aggravated. As discussed below, Mr. Kross's case calls for a sentence of 15 years, slightly below the sentences in the following cases.

1. *United States v. Friedel*, 1:14-cr-383(TSE) (Sentence of 16 years)

This is another case in which the defendant met the minor victim in person and had sex with the minor victim. The defendant also tried to blackmail minor victims who had been recorded. The Court imposed a sentence of 192 months (16 years) in a case in which the defendant met a 15-year-old minor on the internet, caused her to send him pornographic images of herself, *and then had numerous sexual encounters with the minor (that he recorded)*; the defendant also caused four other minors to create and send child pornography, and *used those images in attempts to threaten and blackmail the minors* into engaging in further conduct.

2. *United States v. McGalem*, 1:22cr48 (AJT) (Sentence of 16 years)

The facts of this case do not involve hands-on sexual encounter and thus are more similar to Mr. Kross's case than the aggravated cases discussed above. Significantly, the defendant in this case, unlike Mr. Kross, had an aggravated prior criminal history score. While Mr. Kross is in Category I for Criminal History, this defendant was in Category II.

This production case involved production and attempted production of child pornography from many minors, with guidelines of life imprisonment. The government's sentencing memo notes that the defendant's efforts to produce child pornography "succeeded with Minor Victim 2, who was under the age of 12 years at the time, persuading Minor Victim 2 to take and send pictures of his penis. PSR at ¶ 38. The

defendant used a similar formula to entice and coerce Minor Victim 3 and Minor Victim 6 into sending sexually explicit pictures to him." ECF. Doc. 52 at 5. Further, beyond the identified victims, there were numerous other "explicit images depicting other apparent and suspected minors. None of the minors depicted in these other photos and videos have been identified. And because of the nature of these photos and videos, these minors are unlikely to ever be identified." *Id.* at 6. In contrast to Mr. Kross's case, "The PSR also properly calculated the defendant's criminal history category as a II." *Id.* at 8.

### Prior Sentence of 18 years in Production Case

1. *United States v. Sanders,* 1:20 CR143(TSE) (sentenced to 18 years imprisonment)

The defendant in this case had a demonstrated interest in sexual violence, which he coerced his minor victims to undergo and record. In this case, the government's sentencing memo noted that the

> The defendant is a sexual predator with a demonstrated interest in bondage, torture, and rape. For years, he sought out vulnerable minors online and induced them to record and *send him videos of themselves engaging in sexualized, self-inflicted violence* and other sexual acts. His predation followed a similar pattern: he would find a minor on an online forum or mobile application, chat with the minor, and then introduce "punishments" that required the minor to send him sadomasochistic and pornographic content. At the same time, he was amassing a collection of child pornography from the dark web and other sources depicting shocking acts of sexual violence, including videos depicting the rape of bound-and-gagged children.

ECF Doc. 604 at 1 (emphasis added). Furthermore, this defendant refused to accept responsibility: he went to trial. More so, even after his trial, the defendant displayed no shame or remorse:

> Notwithstanding the severity of his crimes, the defendant has shown no contrition. Instead, he has attempted to shirk responsibility at every turn— claiming, variously, that he did not seek out child pornography (despite

18

having it on nearly every device in his bedroom); that he is a victim who was taken advantage of (that is, by the very minors he exploited); that he was mentoring and "push[ing these minors] to be the best person they can be" (by subjecting them to his abuse); and even that he was protecting them (by exploiting them before some hypothetical offender could). While his excuses are muddled, the through-line is clear: *he lacks a scintilla of remorse*.

*Id.* (emphasis added). And like the defendants referenced above, this defendant too met his minor victims in persons, including forcing one to undergo sexual violence. As reported in the case,

> *several of the victims reported that he met them in person, and one reported that the defendant forcibly locked a cage-like device around his genitals* in his high school's parking lot. A review of his chats, on other hand, makes his true motivations clear: he sought out minors who felt confused or isolated, or ideally both, because he could more easily groom them into engaging in the kind of sadomasochistic relationships he found sexually appealing. When the minors resisted his degrading "punishments"—some of which he described as "cock and ball torture"— the defendant would respond with threats, dismissal, or self-pitying manipulation, suggesting that they failed to appreciate how difficult he had it as their "dom" or "master". And at the same time, he was seeking out videos of minors being whipped, bound, and raped.

*Id.* It is fair to say that despite the admitted seriousness of Mr. Kross's conduct, both his conduct and his mental response to his conduct pale in comparison to the violence and remorseless of this defendant.

2. **A Production Conspiracy: Relevant Prior Sentences include *United States v. Zwengel* 1:15cr42 (TSE) (18 years), *United States v. Hitosis* (18 years), *United States v. Dyke* 1:16cr128 (TSE) (18 years, 2 months), *United States v. McNevin*, 1:15cr42 (19 years), *United States v. Parson* 1:16cr128 (TSE) (17.5 years), and *United States v. Cortez*, 1:16cr128 (17.5 years).**

In this case, a number of individuals conspired to produce child pornography and share it with each other. The general conspiracy is described as follows in the government's sentencing memo of one of the defendants:

19

The conspiracy centered on two websites (Website A and Website B) that were operated for the purpose of coercing and enticing minors to engage in sexually explicit conduct on web camera. Statement of Facts as to Stephen R. Funk (SOF), Dkt. 99 at ¶ 1. Members of the websites recruited minors to visit their websites from mainstream social media websites popular with young children and teenagers. SOF ¶ 2. . . Using a combination of text-chatting and deceptive loop videos, the members of the websites enticed and coerced the minor to engage in sexually explicit conduct on web camera. SOF ¶ 4.

. . .

The sophistication of the conspiracy, including the distinct roles played by members and its technical automation, resulted in the production of approximately 9,000 child pornography videos, and the victimization of potentially 1,000 minors, more than 200 of whom have been identified by the FBI. More than 137 of these victims engaged in sexually explicit conduct on the websites.

These minors and their families have suffered real harm, as documented in the victim impact statement included in the presentence investigative report and as described in the live victim impact statements provided to the court at the sentencing hearings of co-conspirators on September 18 and December 5, 2015. Case No. 1:15-CR-42, Dkt. Nos. 151, 181. The minors have suffered not only by the deception, manipulation, and abuse that led to the creation of videos, but also from the knowledge that they were recorded and viewed by multiple adult members of the conspiracy. They will further suffer from the fear that the videos of them, created through manipulation and without their knowledge or consent, can be more widely circulated.

*United States v. Funk*, 1:15cr172 (TSE), ECF. Doc. 170 at 1, 6-7.[11]

---

[11] Some of the cases in the conspiracy had the aggravating factors like a prior child sexual assault conviction history or failure to accept responsibility, and they received sentences of 21 or 22 years. *See United States v. Funk*, 1:15cr172 (TSE) (22 years) (which according to the government's sentencing memo "differs from these co-conspirators in one other respect. He has a criminal history, which includes a conviction for sexual assault of a child . . . a sentence in this case to 22 years imprisonment . . . would avoid unwarranted sentence disparities); *United States v. Hendrix* 1:15cr172 (21 years) (in which according to the government's sentencing memo, "[t]he defendant did not accept responsibility, pleaded not guilty, and put the government to its burden at trial. This involved the testimony of an 11-year-old minor victim and parents of other minor victims. . . The defendant should therefore receive a greater sentence than his co-conspirators—a sentence in excess of 21 years imprisonment—to account for his lack of acceptance of responsibility for his crime").

***Prior Sentence of 23 years in a Production case: United States v. Joseph Allen, 2:24 CR 16 (EWH)***



Indeed, one can see the better fit of Mr. Kross's case and sentence with the more recent production cases in this district. *See e.g.*, *Janes. supra* (15 year sentence in 2023 where in addition to production "the defendant tried to escalate their encounters by inviting him to spend the night at his house on February 5, 2023."); *Daniel, supra* (15 year, 2 month sentence in 2017 where the defendant "pled guilty to commercial sex with a 14-year old child" and "sexually abused two other minor girls as well"); *Sanders, supra* (18 year sentence in 2020 where the production involved coercing minors to "send him videos of themselves engaging in sexualized, self-inflicted violence," where "several of the victims reported that he met them in person, and one reported that the defendant forcibly locked a cage-like device around his genitals," and where the defendant went to trial, blamed everyone else for his conduct, and "lack[ed] a scintilla of remorse."). In

21

view of these cases, as well as Mr. Kross's background and circumstances as more fully set forth below, a sentence of 15 years is lengthy and appropriate.

### Disparity Analysis

Mr. Kross's conduct was extremely serious. When compared against other cases in this district, a sentence of 15 years is appropriate such that any sentence greater would yield an unwarranted sentencing disparity. Mr. Kross did not touch any child, nor did he ever meet or attempt to meet with any child. He himself never threatened or blackmailed anyone. He has no criminal history. As more fully set forth below, his years of life outside of this offense militate in favor of a lower, but still very serious and lengthy sentence. He accepted responsibility and did not proceed to trial. He feels and expresses remorse. For all these reasons, the mandatory minimum sentence is commensurate with other cases in the district and avoids unwarranted sentencing disparity.

### E.  The sentencing guidelines are entitled to little deference

As in most child pornography cases, the guidelines are substantially inflated. There is a two point enhancement because the material at issue included photographs of minors under the age of twelve. The "United States Sentencing Commission statistics show[] that, in 2009, '94.8% of child pornography sentences involved an image of a prepubescent minor.'" *United States v. D.M.*, 942 F. Supp. 2d 327, 343-44 (E.D.N.Y. 2013). There is a two point enhancement for the use of a computer, which is an out-of-date enhancement from 1995 which in the modern era is effectively part of the base offense level offense, given the ubiquity of computers in 2014. *United States v. C.R.*, 792 F. Supp. 2d 343, 512 (E.D.N.Y. 2011) (reversed on other grounds sub nom. *United States v. Reingold*, 731 F.3d 204 (2d Cir. 2013) ("The two-point enhancement for use of a

computer is not applied. Virtually all child pornography crimes involve the use of a computer. Adding two points results in double counting and is not sufficiently particularized to the facts of the case).

The problems with the child porn guidelines are well documented.  As noted in *D.M.*, 942 F. Supp. 2d, 347- 352:

> The unreasonable harshness of the Guidelines for an offense of child pornography possession, of which defendant is charged, has been recognized by courts and judges from across the country. *See, e.g., United States v. Pulsifer,* 469 Fed.Appx. 41, 44 (2d Cir.2012) (describing the "unusually harsh impact of the child pornography Guidelines"); *United States v. Stone,* 575 F.3d 83, 97 (1st Cir.2009) (expressing the "view that the sentencing guidelines [for child pornography] are in our judgment harsher than necessary"); *United States v. Henderson,* 649 F.3d 955, 964 (9th Cir.2011) (Berzon, J., concurring) (describing the "unjust and sometimes bizarre results" that follow from application of the child pornography Guidelines)
> . . .
> At their inception, in 1987, the Guidelines for child pornography covered only the crimes of transporting, receiving, and trafficking offenses. *See C.R.,* 792 F.Supp.2d at 478. Possession of child pornography was not then a federal crime. *Id.* But, as Harvard Law School professor Carol S. Streiker has recognized: [T]he treatment of child pornography has been a one-way ratchet, repeatedly turned by Congress. In a little more than two decades, the child pornography Guidelines were substantively revised nine times, with each revision either extending the scope of the offense or making the penalty harsher. In the span of a single decade (from 1997 to 2007), the mean sentence of child pornography offenders increased from 20.59–months to 91.30–months confinement—an increase of 443%.
> . . .
> The Court of Appeals for the First, Second, Third and Ninth Circuits—as well as district courts—have expressly recognized what little deference the child pornography Guidelines are owed. *See Dorvee,* 616 F.3d at 188; *Henderson,* 649 F.3d at 960 (holding that "district judges must enjoy the same liberty to depart from [the child pornography guideline] based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in *Kimbrough* ); *United States v. Grober,* 624 F.3d 592, 609 (3d Cir.2010) (affirming district court's decision based on

policy disagreement not to apply recommended Guidelines range for child pornography offense); *Stone,* 575 F.3d at 93 (recognizing district court's authority to vary from child pornography Guidelines); *Munoz,* 2012 WL 5351750, at *4 n. 2 (citing cases); *see also United States v. Huffstatler,* 571 F.3d 620, 623 (7th Cir.2009) (per curiam) ("[W]hile district courts perhaps have the freedom to sentence below the child-pornography guidelines based on disagreement with the guidelines, as with the crack guidelines, they are certainly not required to do so.").

. . .

Widespread criticism from the judiciary and others supports the Sentencing Commission's recent proclamation that it "concurs with the many stakeholders who contend that *the sentencing scheme should be revised* to better reflect both technological changes in offense conduct and emerging social science research and also better account for the variations in offenders' culpability and their sexual dangerousness." Comm'n Rep. on Fed. Child Pornography Offenses 15 (emphasis added). Action must be taken, argues the Commission, to ensure that the Guidelines more rationally "account for recent technological changes in offense conduct and emerging social science research about offenders' behaviors  and histories, and also to better promote the purpose of punishment by accounting for the variations in offenders' culpability and sexual dangerousness." *Id.* at xvii.

## F.  <u>Supervised Release</u>

When applied to Mr. Kross, the sentencing factors enumerated in 18 U.S.C. § 3553(a) mandate a term of supervised release not to exceed fifteen years. As a condition of the Court's sentence, Mr. Kross will receive extensive sex offender treatment, which will further protect the public by preventing recidivism.  This treatment will include an offense-specific evaluation, and a subsequent referral to an offense-specific treatment program.  Mr. Kross will be subject to regular polygraph examinations, individualized treatment, and continued supervision by the Court long after his release from prison.   Reviews of sex-offender-treatment programs show that cognitive-behavioral therapy, relapse prevention, and self-regulation training have proven

24

successful in treating offenders. *See, e.g.*, Tony Ward, Theresa Gannon, and Pamela Yates, *The Treatment of Offenders: Current Practice and New Development with An Emphasis on Sex Offenders*, 15 Int'l Rev. Victimology 183 (2008); Steve Aos, Marna Miller, and Elizabeth Drake, Washington State Institute for Public Policy, *Evidence-Based Adult Corrections Programs: What Works and What Does Not,* at 5-6 (2006) (concluding after review of six "rigorous" studies that "cognitive-behavioral therapy for sex offenders on probation significantly reduces recidivism").

Such treatment, designed to achieve rehabilitation, can and should occur in the community. Kimberly Wiebrecht, *Evidence-Based Practices and Criminal Defense: Opportunities, Challenges, and Practical Considerations* 8 (2008), *available at* http://nicic.gov/library/files/023356.pdf ("[t]he research...states that treatment interventions are more effective when provided to defendants while they are in the community rather than in an institutional setting."); *see also* Bitna Kim *et al.*, *Sex Offender Recidivism Revisited: Review of Recent Meta-analyses on the Effects of Sex Offender Treatment*, 17 Trauma, Violence, and Abuse 1, 11 (2016) ("The research indicates that treatment in the community is more effective than treatment in institutions. Although there may be obstacles to changing existing exclusionary policies; evidence demonstrates that sex offenders, both adolescent and adult, can be treated successfully in community settings.").

A lengthy term of supervision places Mr. Kross under the auspices of the court for many years following his release and will provide him the opportunity to transition from prison to society. Moreover, it will provide him with continued treatment, counseling and

25

supervision, which further serves to protect the public. Finally, it is an essential element to a sentence that is sufficient, but not greater than necessary.

### G.    Recommendation to the Bureau of Prisons

Mr. Kross respectfully requests that the court recommend to the Bureau of Prisons that he be confined at FCI Petersburg, located in Petersburg, Virginia. FCI Petersburg is home to one the BOP's Sex Offender Management Programs (hereinafter SOMP). [12]  The SOMP facilities have a more robust Psychology Department, a Sex Offender Treatment Program (either residential or non-residential), and a higher percentage of sexual offenders in the general population.

According to the Bureau, SOMP facilities are designed to fulfill the unique needs of incarcerated sexual offenders, including:

- Enhanced monitoring for offending behaviors
- Protection from other inmates
- The sometimes more sophisticated criminality of this population

This special mission makes SOMP facilities easier for sex offenders to survive. They enable these inmates to stay at the prison without threat to their lives. By housing this specialized population in certain prisons, prison officials can also monitor them more effectively.  FCI Petersburg provides Mr. Kross the treatment and services he needs, and he wants to participate in them. In addition, this facility is closest to his home and family. While he understands that the BOP is not bound by the court's recommendation, he asks the court to include such a recommendation in its sentencing order.

---

[12] https://www.bop.gov/policy/progstat/5324_010.pdf

26

## Conclusion

WHEREFORE, for the foregoing reasons, and any others that may appear to the court or that may develop at the sentencing hearing, Andrew Kross, through counsel, respectfully requests that this Honorable Court sentence him to a term of fifteen years' imprisonment. Mr. Kross has already begun severe punishment for his actions.  He lost his career.  When released, he will be jobless, and a registered sex offender with a public conviction with the facts of this case.  Collectively, these consequences, together with a 15-year sentence of imprisonment, takes into account the history and characteristics of Mr. Kross and his conduct and is sufficient but not greater than necessary to provide adequate deterrence, to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Respectfully submitted,

ANDREW KROSS

By: _____/s/_____
Rodolfo Cejas, II
Virginia Bar No.: 27996
Attorney for Andrew Kross
Office of the Federal Public Defender
500 East Main Street, Suite 500
Norfolk, Virginia 23510
(757) 457-0885 (telephone)
(757) 457-0880 (facsimile)
email: Rodolfo_Cejas@fd.org

_____/s/_____
Christopher Leibig, Esq.
Virginia Bar No. 40594
Counsel for Andrew Kross
421 King Street #505
Alexandria, Virginia 22314
Phone: (703) 683 4310
Email: Chris@chrisleibiglaw.com

27

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of January 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

By: _____/s/_____
Rodolfo Cejas, II
Virginia Bar No.: 27996
Attorney for Andrew Kross
Office of the Federal Public Defender
500 East Main Street, Suite 500
Norfolk, Virginia 23510
(757) 457-0885 (telephone)
(757) 457-0880 (facsimile)
Rodolfo_Cejas@fd.org